Case No. 16-25190-CIV-GRAHAM/McALILEY

TANNIE BURKE,

    Plaintiff

vs.

MIAMI-DADE COUNTY, a political
subdivision of the State of
Florida, and CLIFTON BALDWIN and
JULIO MARTOS, residents of the
State of Florida,

    Defendants.

_____/

## ORDER

**THIS CAUSE** comes before the Court upon Defendants Miami-Dade County, Clifton Baldwin, and Julio Martos' Motion to Dismiss Counts II and V of the Complaint ("Motion to Dismiss") [D.E. 10]. Plaintiff Tannie Burke subsequently filed his Response to Motion to Dismiss Counts II and V of the Complaint ("Response") [D.E. 17], to which the Defendants filed their Reply in Support of Motion to Dismiss Counts II and V of the Complaint ("Reply") [D.E. 18].

**THE COURT** has reviewed the record and is otherwise fully advised in the premises. As set forth herein, the Defendants' Motion to Dismiss is granted as to Counts II and V.

## I.    BACKGROUND[1]

Burke contends that on August 27, 2014, Officers Baldwin and Martos, while engaged in their duties as police officers, found a single marijuana cigarette on the floor of a second-floor landing and arrested him and two other Black men. Burke did not have any marijuana in his possession, and he was not smoking marijuana. Burke submits that two of the men were released after the officers gave them notices to appear in court, however, he was placed in handcuffs and forced to walk down the stairs without police assistance. Notably, Burke suffers from Coats' disease[2], is legally blind in his left eye, and is only able to see shapes and greater detail within inches of what he is trying to see with his left eye. With his right eye, he can only see light and make out shapes and his right eyebrow and side of his forehead are swollen and protrude over his right eye. Burke states that there is no way of looking at

---

[1] This account of the facts is taken from Burke's Complaint [D.E. 1], the allegations the Court must accept as true when considering Defendants' Motion to Dismiss. See SEC v. ESM Grp., Inc., 835 F.2d 270, 272 (11th Cir. 1988).

[2] Coats' disease is a disease of the retinal blood vessels, which can be quite variable in its effect on vision. It may present in early childhood but typically occurs later in life. It usually only affects one eye. Many patients with Coats' disease have minimal visual problems but, in some individuals, it can cause severe retinal damage leading to blindness. AMERICAN ACADEMY OF OPHTHALMOLOGY, https://www.aao.org/eye-health/ask-ophthalmologist-q/what-is-coats-disease (last visited Sept. 6, 2017).

his face without being alerted to the fact that he has a physical disability.

Burke alleges his stepfather, Marvin Armstrong, has often criticized the police for profiling Black and African-American males in his neighborhood based upon race. Burke further alleges that Mr. Armstrong has frequently videotaped police activity, enraging local police. Indeed, Officers Baldwin and Martos knew that Burke and Mr. Armstrong were related and, in fact, Mr. Armstrong was videotaping the police at the time this incident occurred.

After arrest, instead of taking Burke to jail or to the police station, Officers Baldwin and Martos placed him in the front passenger seat of an unmarked vehicle. While trying to sit down, Burke's body collided with the top frame of the vehicle. Mr. Amrstrong, irate that Burke was being falsely arrested and unassisted because he is blind, said the following to the police as they were loading him into the car: "He blind dumbass. Y'all don't tell him y'all walk him to the car, how the fuck he gonna know? Stupid." Officers Baldwin and Martos then entered the police vehicle with Burke and drove away.

Officers Baldwin and Martos claim that they received a radio transmission over an official frequency that a suspect was fleeing in the area and decided to assist with the search. Burke, however, never heard the alleged audio transmission.

Coincidentally, all relevant radio-transmission records were destroyed before the Miami-Dade Police Department Professional Compliance Bureau investigators began their investigation. With Burke in the car, Officers Baldwin and Martos allegedly complained repeatedly about Mr. Armstrong's actions, as opposed to making comments about a fleeing suspect or any other search. Burke specifically recalls the officers saying, "Your stepfather got a lot of mouth. You know we don't like that."

After driving around for a while, Officers Baldwin and Martos decided to release Burke with a promise to appear. They directed him to exit the car and walk to its rear. As he is blind, Burke was only able to do so by moving his hands across the car to guide himself. The officers then presented Burke with a document to sign. When Burke told them that he could not see the document, they placed a large light on it. Burke repeatedly told Officers Baldwin and Martos that he was unable to see and described his sight limitations to them.

When it became clear that the officers intended to leave Burke out in the dark, rural, lightless area, Burke asked them to drive him back to his neighborhood. He also told the officers that he could not be dropped off at a bus stop or busy street because of his condition. Officers Baldwin and Martos refused. Instead, they drove onto a dark, secluded, rural street without any lighting and dropped Burke off on the edge of some darkened

farmland tract miles from his home. For the better part of an hour, Burke trudged along the roadside. He followed the asphalt's edge or the white stripe to maintain his direction as he sought to find his way home. Burke claims he was in constant danger of being hit by vehicles or attacked by criminals. While walking, Burke eventually came upon a Good Samaritan who helped him navigate his way home. Burke states that Officers Baldwin and Martos did this to him as an act of retaliation against Mr. Armstrong because his stepfather had the audacity to question their activities. Burke attests that he has been traumatized, stigmatized, and left in fear as to when something like this will occur again. He contends that he has suffered mental and psychological damage, damage to his reputation, and is in fear for his life by being placed in a circumstance where his safety and life were in peril.

## II.  LEGAL STANDARD

Under Rule 8, allegations within a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a complaint is challenged under Rule 12(b)(6), a court will presume that all well-pleaded allegations are true, and view the pleadings in the light most favorable to the plaintiff. Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1066 (11th Cir.

2007). The Supreme Court of the United States has held that although a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not suffice. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp., 550 U.S. at 570). For a claim to have facial plausibility and survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Id. Therefore, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court is generally limited to the four corners of the complaint and pertinent attached documents. Grossman v. Nationsbank, N.A., 225 F.3d 1228, 1231 (11th Cir. 2000).

**III. DISCUSSION**

Counts II and V of Burke's Complaint are dismissed for the following reasons: (1) Burke fails to allege a deliberate indifference to serious medical needs claim while in custody; (2) Burke fails to allege a deliberate indifference to an extremely great risk of serious injury claim after his release from custody; (3) assuming Burke successfully alleged a constitutional violation, Officers Baldwin and Martos are entitled to qualified immunity; and (4) Burke fails to allege a claim under Title II of the ADA. Before the Court analyzes the issues at bar, it briefly discusses whether Officers Baldwin and Martos were sued in their individual or official capacity.

Burke brings this suit against Miami-Dade County and Officers Baldwin and Martos, but he does not specify whether he is suing the officers in their individual or official capacity. For the sake of clarity, the Court briefly discusses the context in which Burke sues the officers.

When a plaintiff's identification of a defendant's capacity is unclearly stated in the complaint, "the course of proceedings typically indicates the nature of the liability sought to be imposed." Jackson v. Ga. Dep't of Transp., 16 F.3d 1573, 1575 (11th Cir. 1994). The standard for an official-capacity suit is that the entity's "policy or custom" must have played a role in the alleged constitutional violation. Kentucky v. Graham, 473

U.S. 159, 166 (1985). For an individual-capacity suit, however, the plaintiff must seek to impose liability against the official for actions taken under color of state law. Id. at 166 ("On the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.").

Although Burke states in his Complaint that Officers Baldwin and Martos were both "acting in their official capacity as employees of Miami-Dade County," this assertion is not located in the qualified immunity section of the briefing. Indeed, none of Burke's arguments reference the official-capacity standard; rather, his arguments reference the individual-capacity standard. Burke does not allege that the officers were following a Miami-Dade Police Department policy or custom when they dropped him off on the side of the road away from his home. Burke also argues that the officers' actions were taken under color of state law. Additionally, the case's stylization does not state that Officers Baldwin and Martos are being sued in their official capacity. Instead, it states that Burke is suing them as "residents of the State of Florida." As such, the Court reads the Complaint to sue Officers Baldwin and Martos in their individual capacity. See generally Kentucky, 473 U.S. at 166; Miccosukee Tribe of Indians of Fla. v. Jewel, 996 F. Supp. 2d 1268, 1272-73 (S.D. Fla. 2013); Louisius v. Fla.

<u>Dep't of Corr.</u>, No. 6:14-cv-931-Orl-40GJK, 2015 WL 667973, at *4 (S.D. Fla. Feb. 17, 2015).[3]

### A. Count II – Deliberate Indifference Claim

In their Motion to Dismiss, Officers Baldwin and Martos argue that the Court should dismiss Count II because the "facts alleged in the Complaint fail to support the elements of a 'failure to render aid' claim."[4] Specifically, the officers submit that Burke cannot allege that he suffered a serious medical need as defined by the Eleventh Circuit. Additionally, they argue that they are entitled to qualified immunity because Burke did not suffer a constitutional violation and, even if he did, that right was not clearly established at the time the alleged violation occurred.

In his Response, Burke states for the first time that the acts of Officers Baldwin and Martos constituted an unjustified intrusion of bodily integrity. Specifically, Burke alleges that "[s]uch conduct can be nothing less than actionable negligence,"

---

[3] Notwithstanding, this is a moot issue because, as previously stated, Burke fails to allege adequate facts to state claims for which relief can be granted. <u>See</u> Fed. R. Civ. P. 12(b)(6).

[4] A failure to render aid claim appears synonymous with a deliberate indifference to serious medical needs claim. Thus, this Court will address Count II as a deliberate indifference to serious medical needs claim. <u>Compare</u> <u>Olson v. Barrett</u>, No. 6:13-cv-1886-Orl-40KRS, 2015 WL 1277933 (M.D. Fla. Mar. 20, 2015), <u>with</u> <u>Adams v. Custer</u>, No. 14-CV-80403-CIV-HURLEY, 2016 WL 155081 (S.D. Fla. Jan. 12, 2016); <u>see also</u> <u>Melton v. Abston</u>, 841 F.3d 1207 (11th Cir. 2016).

which shocks the conscience. Burke also argues that Officers Baldwin and Martos are not entitled to qualified immunity because they were not acting within their discretionary authority and their conduct violated clearly established constitutional law. Peculiarly, Burke cites White v. Rochford, 592 F.2d 381 (7th Cir. 1979), and Matheny v. Boatright, 970 F. Supp. 1039 (S.D. Ga. 1997), for the proposition that the officers conduct, leaving Burke on a dark, rural road, violated clearly established constitutional law at the time of the incident. The United States Court of Appeals for the Eleventh Circuit, however, has traditionally held that only cases from three courts, the Supreme Court, the Eleventh Circuit, and the Florida Supreme Court, can clearly establish law in this jurisdiction. See Loftus v. Clark-Moore, 690 F.3d 1200, 1204 (11th Cir. 2012).

In their Reply, Officers Baldwin and Martos state that they acted within their discretionary authority when they took Burke into custody, transported, and released him. Additionally, they assert that Burke fails to identify facts that abrogate the officers' entitlement to qualified immunity. Specifically, Officers Baldwin and Martos aver that Burke fails to cite any pertinent Supreme Court, Eleventh Circuit, or Florida Supreme Court case for the proposition that the right they allegedly violated was clearly established.

Before proceeding further, the Court notes that the Parties failed to specifically identify and fully brief key issues in this matter, such as the elements required to plead a deliberate indifference claim and whether Burke adequately alleged this claim, which are more fully discussed below. Such briefing is integral to assist the Court in achieving just resolutions. This is especially true when a case presents facts as unique as the facts currently before the Court. The Court now delves into the issues surrounding Count II.

To prevail on a civil rights action under Section 1983, a plaintiff must show that he or she was deprived of a federal right by a person acting under color of state law. Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001). A person acts under color of state law when he or she acts with the authority possessed by virtue of his employment with the state. Id. It is firmly established that a defendant in a Section 1983 suit acts under the color of law when he abuses the position given to him or her by the state. Id.

The first inquiry in reviewing a plaintiff's Section 1983 claim is to determine whether the plaintiff sufficiently alleged a constitutional or statutory violation. Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1305 (11th Cir. 2009). Only if a plaintiff adequately alleges such a violation must the court examine the alleged basis for liability on the part of the person acting

under color of state law. <u>Id.</u> Without a violation, there can be no violation of a clearly established right. <u>Id.</u> In his Complaint, Burke pleads a Fourteenth Amendment substantive due process violation under a failure to render aid theory.

"Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners." <u>Cottrell v. Caldwell</u>, 85 F.3d 1480, 1490 (11th Cir. 1996). The applicable standard, however, is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees. <u>Id.</u>

Considering the unique facts of this case, this Court deems an in-depth discussion of <u>County of Sacramento v. Lewis</u>, 523 U.S. 833 (1998) necessary to fully explain the analytical framework required to resolve Count II. <u>Lewis</u> is a seminal case in Section 1983 jurisprudence and reaffirmed the "shocks the conscience" standard applicable in this case.

The Supreme Court has emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government. <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 845 (1998). This is true if the fault lies in a denial of fundamental procedural fairness or in the exercise of power without any reasonable justification in the

service of a legitimate government objective. Id. at 845-46. Cases dealing with abusive executive action repeatedly emphasize that only the most egregious official conduct is arbitrary in the constitutional sense. Id. at 846. The Due Process Clause was intended to prevent government officials from abusing their power or employing it as an instrument of oppression. Id.

To this end, for more than a half century now, the Supreme Court has spoken of the cognizable level of executive abuse of power as that which shocks the conscience. Id. "The substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." Id. at 847. (internal quotation marks omitted). While the measure of what is conscience shocking is no calibrated yard stick, it does point the way. Id.

It is unsurprising that the constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of tort law's culpability spectrum. Id. at 848. The Supreme Court has made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm. Id. The Fourteenth Amendment is not a font of tort law to be superimposed upon whatever

systems may already be administered by the States. Id. The Constitution does not guarantee due care on the part of state officials; instead, liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. See id. at 849. "It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id.

"Whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls." Id. To be sure, the Supreme Court has expressly recognized the possibility that some official acts in this range may be actionable under the Fourteenth Amendment and, further, some cases have compelled recognition that such conduct is egregious enough to state a substantive due process claim. Id. Because it may suffice for Eighth Amendment liability that prison officials were deliberately indifferent to the medical needs of their prisoners, it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due

process claims based on the medical needs of someone in custody. See id. at 850.

"Rules of due process are not, however, subject to mechanical application in unfamiliar territory." Id. Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking. Id. "As the very term, 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical." Id. at 851. In the custodial situation, forethought about an in-custody individual's welfare is not only feasible but obligatory under a regime that incapacitates that person's ability to exercise ordinary responsibility for his own welfare. See id. at 851 (stating that in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare).

"When the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." Id. The rationale for this principle is simple. Id. When the State, by the affirmative exercise of its

power, restrains an individual's liberty to the extent that it
renders him or her unable to care for him or herself, and at the
same time fails to provide for his basic human needs, including
reasonable safety, it transgresses the substantive limits on
state action set by the Fourteenth Amendment Due Process Clause.
Id. Nor does any substantial countervailing interest excuse the
State from making provisions for the decent care and protection
of those it locks up. Id. Rather, the State's responsibility to
attend to the medical needs of people in custody does not
ordinarily clash with other equally important government
responsibilities. Id. at 852.

The police, on occasion, encounter situations calling for
fast action and have obligations that tend to tug against each
other. Id. at 853. Their duty is to restore and maintain lawful
order, while not exacerbating disorder more than necessary to
properly do their jobs. Id. They are supposed to act decisively
and to show restraint at the same moment, and their decisions
have to be made in haste, under pressure, and frequently without
the luxury of a second chance. Id. (quotation marks omitted).
Indeed, when extended opportunities to do better are teamed with
protracted failure even to care, indifference is truly shocking.
Id. But when unforeseen circumstances demand an officer's
instant judgment, even precipitate recklessness fails to inch
close enough to harmful purpose to spark the shock that

implicates the large concerns of the governors and the governed. Id.

Here, the alleged violation apparently occurred at the time Officers Baldwin and Martos released Burke from custody. Therefore, the Court briefly reviews the Eleventh Circuit's deliberate indifference case law in the custodial versus non-custodial context because the applicable law depends upon whether a custodial relationship existed between the Defendants and Burke.

State and local government officials violate the substantive due process rights of individuals not in custody only when those officials cause harm by engaging in conduct that is arbitrary, or conscience shocking, in a constitutional sense. White v. Lemacks, 183 F.3d 1253, 1259 (11th Cir. 1999) (quotation marks omitted). That standard is to be narrowly interpreted and applied. Id. In 2002, the Eleventh Circuit explicitly stated that deliberate indifference is insufficient to constitute a due-process violation in a non-custodial setting. Nix v. Franklin Cnty. Sch. Dist., 311 F.3d 1373, 1377 (11th Cir. 2002). Said differently, "generally, individuals not in state custody will have no due-process claim for unsafe conditions. . ." Id. at 1378. A year later, in 2003, the Eleventh Circuit then stated that a "substantive due process violation would, at the very least, require a showing of

deliberate indifference to an extremely great risk of serious injury to someone in [p]laintiff's position." <u>Waddell v. Hendry Cnty. Sheriff's Office</u>, 329 F.3d 1300, 1306 (11th Cir. 2003).[5]

Given the Eleventh Circuit's seemingly differing case law regarding custody versus non-custody, paired with the unique facts of this case, the Court analyzes both scenarios. Against this backdrop, the Court will now determine whether Burke sufficiently alleged a Section 1983 violation.

## 1. Deliberate Indifference – Custodial

To state a custodial deliberate indifference to serious medical needs claim under the Fourteenth Amendment, a plaintiff must allege the following: (1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury. <u>Mann</u>, 588 F.3d at 1306-07. A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for the doctor's attention. <u>Id.</u> at 1307. In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition. <u>Id.</u> In either

---

[5] The Eleventh Circuit went on to state that "[w]e stress the phrase 'at the very least.' We do not rule out today that the correct legal threshold for substantive due process liability in a cause like this one is actually far higher." <u>Waddell</u>, 329 F.3d at 1306 n.5.

case, the medical need must be one that, if left unattended, poses a substantial risk of serious harm. Id.

Burke fails to allege a deliberate indifference to serious medical needs claim when in custody. Specifically, he cannot even satisfy the first prong, a serious medical need. In his Complaint, Burke claims that he "suffers from Coats' disease, is legally blind in the left eye, and only able to see shapes and greater detail if inches from what he is trying to see." He submits that "[h]e can only see light and make out shapes with his right eye and the eyebrow and forehead area above the right eye is swollen and protrudes over his right eye." Burke avers that "the disease has affected him physically to the point where one of his eyes is basically shut," and that "[t]here is no way of looking at [his] face and his affect without being alerted to the fact that he has a physical disability." Absent from Burke's Complaint, however, are any allegations that he had a serious medical need as defined above that, if left unattended, posed a substantial risk of serious harm. Thus, Burke fails to allege a deliberate indifference to serious medical needs claim when in custody.

### 2. Deliberate Indifference – Non-custodial

To state a deliberate indifference claim when not in custody, a plaintiff must at least allege deliberate

indifference to an extremely great risk of serious injury to someone in the plaintiff's position. <u>Waddell</u>, 329 F.3d at 1306. "To act with deliberate indifference, a state actor must know of and disregard an excessive – that is, an extremely great – risk to the victim's health or safety." <u>Id.</u>

Similarly, Burke fails to allege a deliberate indifference to an extremely great risk of serious injury claim when he was released from custody. Specifically, he has alleged that the officers had time to deliberate before they left him in a rural, secluded area, but he has not alleged any facts that demonstrate he was subjected to an "extremely great risk of serious injury." <u>See</u> <u>Waddell</u>, 329 F.3d at 1306. Burke claims in his Complaint that "[a]fter riding him around for a period of time, during which he was handcuffed, the officers decided to release [him] with a [promise to appear]." Then "[t]hey directed him to get out of the car and to walk to the rear of the car." "[W]hen it became clear that the officers intended to leave [Burke] out in the dark, rural, light-less area, [he] asked the officers to drive him back to his neighborhood." He also informed Officers Baldwin and Martos that he could not be dropped off at a bus stop or busy street because of his condition. Nonetheless, "[t]he officers refused." "Instead, they drove onto a dark, secluded, rural street without any lighting and dropped [Burke]

off on the edge of some darkened farmland tract miles from his house." "It was pitch black dark."

"For the better part of an hour[,] [he] threaded his way along the side of the road, following the edge of asphalt or the white stripe to maintain direction, as he sought to find his way home, a blind man, unfamiliar with his location." "As he walked, he was in constant danger of being hit by vehicles or attacked by criminals." "Eventually, [however], he came upon a good Samaritan who assisted him in returning to his home."

Burke fails to allege that Officers Baldwin and Martos knew of and disregarded an excessive, that is, an extremely great, risk to his health or safety. In his Complaint, Burke states that "he was in constant danger of being hit by vehicles or attacked by criminals;" however, there are no allegations that Officers Baldwin and Martos *knew of and disregarded this danger*. Also lacking from Burke's allegations are facts that demonstrate he was subjected to an extremely great risk of physical injury. He specifically states that he was dropped off on a dark, rural, lightless, and secluded street without any lighting on the edge of some darkened farmland tract miles from his house. Indeed, the fact that the street was in a rural and secluded area is important. While dropping Burke off in a rural and secluded area undoubtedly created some level of risk to his health or safety considering his Coats' disease and blindness, it did not create

an *extremely great risk* of *serious injury*. If the officers'
conduct did not create an extremely great risk of serious
injury, then the Court cannot find that it shocks the
conscience. Thus, Burke fails to allege a deliberate
indifference to an extremely great risk of serious injury claim
when the officers released him from custody.

The Court concludes that, based on the specific facts of
this case, Burke cannot allege a constitutional violation
actionable under Section 1983. See id.; Nix, 311 F.3d at 1377
(stating that deliberate indifference to a plaintiff's safety
may constitute a tort under state law, even though it does not
rise to the level of a substantive due process violation under
the federal Constitution); Lewis, 523 U.S. at 848-49. The Court
is limited to reviewing the claims alleged in the four corners
of the Complaint; that is, deliberate indifference to serious
medical needs. To the extent that Burke alleges an "unjustified
intrusion of bodily integrity" claim as titled in his Response,
this fleeting claim was not alleged in his Complaint and also
fails because the officers' conduct did not shock the
conscience.

### 3. Qualified Immunity

Assuming, *arguendo*, that Burke properly stated a non-
custodial deliberate indifference to an extremely great risk of

22

serious injury claim, Burke's claim still fails as Officers Baldwin and Martos are entitled to qualified immunity because they did not violate a clearly established right of Burke's.

In cases where defendants are entitled to qualified immunity, it is imperative that they receive the benefits of that defense prior to trial through Federal Rules of Civil Procedure 12(b)(6), 12(c), or 56(c). Cottrell, 85 F.3d at 1487. That imperative results from the nature of the entitlement to qualified immunity. Id. "The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Id. (quotation marks omitted). The defense is meant to give government officials a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery. Id.

Qualified immunity protects government officials performing discretionary functions from liability for civil damages in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. Melton, 841 F.3d at 1220. This immunity balances the need for official accountability with the need to permit officials to engage in their discretionary duties without fear of personal liability or harassing litigation. Id. But qualified immunity does not protect an

official if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff. Id. at 1220-21.

For government officials to enjoy qualified immunity, they must first establish that they were acting within the scope of their discretionary authority when the alleged wrongful acts occurred. Id. at 1221. A government official proves that he acted within his discretionary authority by showing objective circumstances which could compel the conclusion that his action were undertaken pursuant to the performance of his duties and within the scope of his authority. Courson, 939 F.2d at 1487. Discretionary authority includes the job-related powers and responsibilities that the public official has in the general fulfillment of his official duties. See O'Rourke v. Hayes, 378 F.3d 1201, 1205 (11th Cir. 2004) ("[I]n determining whether a police offer may assert qualified immunity . . . we do not ask whether he has the right to engage in unconstitutional searches and seizures, but whether engaging in searches and seizures in general is a part of his job-related powers and responsibilities."); see also Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004) ("One might reasonably believe that violating someone's constitutional rights is never a legitimate job-related function or within the scope of a government

official's authority or power. As we explained in [a prior Eleventh Circuit opinion], however, 'the inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an untenable tautology.' [Instead], we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.").

Here, Officers Baldwin and Martos were acting within their discretionary authority. Indeed, the officers seizing Burke, taking him into custody, transporting him as a suspected criminal, and then releasing him with a promise to appear are part of their job-related powers and responsibilities. Temporarily putting aside the fact that the officers' actions may have been unconstitutionally committed, their actions were within their discretionary authority. Burke's reliance on Kaisner v. Kolb, 543 So. 2d 732 (Fla. 1989) is misplaced because, in Kaisner, the immunity at issue was not the qualified immunity defense available to government actors sued in their individual capacities. Rather, Kaisner addressed whether the employee's acts were of a discretionary nature so as to provide the municipal police department with sovereign immunity for the employee's actions.

Once it has been determined that an official acted within their discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity is inappropriate. Melton, 841 F.3d at 1221. First, the plaintiff must show that the official's alleged conduct violated a constitutionally protected right. Id. Second, the plaintiff must demonstrate that the right was clearly established at the time of the misconduct. Id. A plaintiff must satisfy both of the analysis' prongs to overcome a defense of qualified immunity. Id. Indeed, the determination of these elements may be conducted in any order. Id.

Regarding this qualified immunity analysis, the Court assumes, *arguendo*, that Burke adequately alleges a non-custodial deliberate indifference to an extremely great risk of serious injury claim under the Fourteenth Amendment. This would satisfy the first prong. Now the inquiry turns to whether that constitutionally protected right was clearly established at the time of the misconduct.

A right is clearly established if a reasonable official would understand that his conduct violates that right. Melton, 841 F.3d at 1221. The touchstone of the "'clearly established'" inquiry is whether the official had "'fair warning'" and notice that his conduct violated the constitutional right in question. Id. For the law to be clearly established, case law must

ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates a federal law. Id. The Court looks to the binding precedent set forth in the decisions of the Supreme Court, the Eleventh Circuit, or the highest court of the state, the Florida Supreme Court here, to decide whether a right is clearly established. Id. Typically, exact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law. Id.

A narrow exception to the rule requiring particularized case law exists. Id. This exception applies in situations where the official's conduct so obviously violates the constitution that prior case law is unnecessary. Id. A broad statement of legal principle announced in case law may be sufficient if it established with obvious clarity to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct violated federal law when the official acted. Id. We likewise recognize the obvious-clarity exception where conduct is so bad that case law is unnecessary to establish that the conduct cannot be lawful. Id.

A review of Supreme Court, Eleventh Circuit, and Florida Supreme Court case law reveals that there is no case similar to

this case to abrogate the officers' entitlement to qualified immunity. Indeed, Burke fails to cite to any Supreme Court, Eleventh Circuit, or Florida Supreme Court cases to support his assertion that Officers Baldwin and Martos are not entitled to qualified immunity. Rather, he cites to a Seventh Circuit case and a Southern District of Georgia case. The Seventh Circuit and our sister district, however, cannot clearly establish a constitutionally protected right under binding Eleventh Circuit precedent. See Melton, 841 F.3d at 1221. Nonetheless, deliberate indifference to a plaintiff's safety may constitute a tort under state law, even though it does not rise to the level of a substantive due process violation under the federal Constitution. See Nix, 311 F.3d at 1376-77. The obvious-clarity exception is also inapplicable here. Thus, Officers Baldwin and Martos are entitled to qualified immunity because no pertinent Supreme Court, Eleventh Circuit, or Florida Supreme Court case law clearly establishes the right Officers Baldwin and Martos allegedly violated.

### B. Count V – ADA Claim

In their Motion to Dismiss, the County argues that the Complaint must be dismissed "because Plaintiff alleges no facts to suggest that he was denied any services, programs, or activities, or otherwise discriminated against because of his

disability." Specifically, the County makes two arguments. First, it submits that there are "no cases equating a 'competent police force' with a public service, program, or activity under the ADA." Second, the County avers that Burke's "claim fails . . . [because] there is nothing alleged to suggest that the County deprived [Burke] of a benefit it would have bestowed on someone else *because of his blindness*." The County asserts that "the lack of any facts supporting a causal connection between a deprivation of [Burke's] right to a service or program offered by the County and his disability dooms his ADA claim from the start."[6]

In his Response, Burke asserts that he adequately alleged facts to support his ADA claim. Burke specifically states that he is entitled to a competent police force and there is a causal

_____

[6] Due to Burke's erroneous conflation of the elements for a Title II Americans with Disabilities Act ("ADA") claim and the elements for a Section 1983 municipal liability claim under theories of "failure to train" and "failure to adopt policies and practices," the County also briefed municipal liability in its Motion to Dismiss. In his Response, Burke clarified that "[t]he only claim against the County is . . . Count IV . . . and the ADA claim, Count V, which is not a 'constitutional claim.'" In footnote five of its Reply, the County stated that, "[i]n writing the Motion to Dismiss, the County struggled to understand the kind of claim [Burke] was alleging, and admittedly guessed that the claim was a" municipal liability claim. The Court understands the County's confusion. Untangling Burke's jumbled ADA claim was unnecessarily onerous. As previously stated, the Parties shall take care to clearly state their positions going forward. Upon reviewing Burke's Complaint, the Court declines to consider any municipal liability claim regarding Count V pursuant to Burke's Response. Accordingly, the Court will limit its Count V discussion to Burke's ADA claim.

connection between the officers' conduct and his blindness. In its Reply, the County claims "that there is nothing within or about Title II or cases interpreting its scope that would suggest it governs the treatment of disabled arrestees after they are released from [police] custody." The County also submits that Burke's allegations are conclusory and provide facts to support that he was discriminated against "***because of his disability***."

To state a claim under Title II of the ADA, a plaintiff must allege the following: (1) that he or she is a qualified individual with a disability; (2) that he or she was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity or otherwise discriminated against by such entity; and (3) said disability was the reason for the exclusion, denial of a benefit, or discrimination. See 42 U.S.C. § 12131; Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001); Bircoll v. Miami-Dade County, 480 F.3d 1072, 1083 (11th Cir. 2007).

Here, neither party appears to dispute that Burke satisfies the first prong of a Title II ADA claim. Under Bircoll, Miami-Dade County is clearly a public entity under the second prong of a Title II claim and the Miami-Dade Police Department is an extension of Miami-Dade County. Bircoll, 480 F.3d at 1083. The crux of this issue, however, is whether Burke was excluded from

participation in or denied the benefits of the services, programs, or activities of Miami-Dade County or otherwise discriminated against by it because of his blindness. See id.

Burke fails to allege facts in his Complaint stating that Officers Baldwin and Martos dropped him off away from his home because of his disability. Specifically, Burke fails to allege that he was denied the enjoyment of a service or benefit that an otherwise non-blind person would have enjoyed. That is, Burke does not assert facts that imply that a non-blind person would have been driven back to his or her home. This case is fundamentally different from cases where a disabled plaintiff, for example, cannot access a county building where someone without that disability can. See generally Shotz, 256 F.3d 1078-81 (stating that plaintiffs properly alleged an ADA Title II claim because a courthouses' wheelchair ramps and bathrooms impeded their ability to attend trials at the courthouse unlike people without their disabilities). Indeed, the only non-conclusory reason Burke alleges is that Officers Baldwin and Martos dropped him off away from his home as retaliation against his stepfather. Such a fact, however, is insufficient to allege a claim under Title II of the ADA.

## IV. CONCLUSION

In conclusion, Burke fails to allege a custodial deliberate indifference to serious medical needs claim and a non-custodial deliberate indifference claim. Assuming, *arguendo*, that Burke properly stated a non-custodial deliberate indifference to an extremely great risk of serious injury claim, Burke's claim still fails because Officers Baldwin and Martos are entitled to qualified immunity. Lastly, Burke fails to allege a claim under Title II of the ADA. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that the Defendants' Motion to Dismiss [D.E. 10] is **GRANTED**. Counts II and V of the Complaint [D.E. 1] are **DISMISSED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this <u>18th</u> day of September, 2017.

s/ Donald L. Graham
DONALD L. GRAHAM
UNITED STATES DISTRICT JUDGE

cc: United States Magistrate Judge McAliley

      All Counsel of Record